THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JAMES HAMMOCK, JR., Defendant-Appellant.

First District (3rd Division)   No. 80—1597

Opinion filed February 8, 1984.

Chester L. Blair, Chartered, of Chicago (Chester L. Blair, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Lester M. Joseph, and Lawrence R. Stasica, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE RIZZI delivered the opinion of the court:

In a jury trial, defendant, James Hammock, Jr., was convicted of murder, and he was sentenced to 28 years in prison. We reverse the conviction and remand the case for a new trial because the State violated defendant's fifth amendment right to have counsel present during custodial interrogation,[1] and because the second of two videotape reenactments of the homicide was admitted into evidence after the State failed to produce the first videotape.

Defendant admits shooting and killing Anthony Taylor while Taylor was in the back seat of an automobile. According to defendant, at the time of the shooting, he was leaning into the automobile and struggling with Taylor. Defendant claims that during the struggle Taylor threatened to kill him and that Taylor drew a gun and aimed it at him. Defendant also claims that, in fear for his life, he drew his own gun and killed Taylor. After the shooting, defendant fled the scene.

The homicide occurred in Brookfield, Illinois, at about 7 p.m. on Friday, June 23, 1978. Later that evening, defendant was arrested in Chicago on a speeding charge for traveling 60 miles per hour in a 55-mile-per-hour zone. He was asked to take a breathalyzer test, and he refused on the basis that he wanted to see his attorney first. He was then taken, without further interrogation, to a police station in Chicago where he remained locked up for about 12 hours. On Saturday

---

[1]The custodial interrogation occurred before defendant was indicted or adversary criminal proceedings were otherwise begun. Thus, defendant's sixth amendment right to counsel had not yet arisen. (*Edwards v. Arizona* (1981), 451 U.S. 477, 480 n.7, 68 L. Ed. 2d 378, 383 n.7, 101 S. Ct. 1880, 1883 n.7.) However, his fifth amendment right to counsel as identified in *Miranda* existed during the custodial interrogation. (*Edwards v. Arizona* (1981), 451 U.S. 477, 481-82, 68 L. Ed. 2d 378, 384, 101 S. Ct. 1880, 1883; see *People v. White* (1975), 61 Ill. 2d 288, 294-95, 335 N.E.2d 457, 461-62.) For a discussion of the distinction between one's fifth amendment and sixth amendment rights to counsel, see *Wyrick v. Fields* (1982), 459 U.S. 42, 52-55, 74 L. Ed. 2d 214, 222-23, 103 S. Ct. 394, 399-400 (Marshall, J., dissenting).

afternoon, he was taken to the county jail, where he remained until Sunday afternoon. At about 5 p.m., three Brookfield police officers appeared at the county jail. One of them advised defendant that he was wanted in connection with the homicide that occurred in Brookfield. The officer gave defendant *Miranda* warnings, and defendant's response, as reflected by his uncontradicted testimony, was as follows:

"A. I told them that my people will have a lawyer out there. Probably Monday because today is Sunday and I don't think I can reach my lawyer on a Sunday.

Q. At that point. They simply told you the rights, you answered saying that you didn't know if you could get your lawyer because it was on a weekend or Sunday?

A. Sunday afternoon, right.

Q. And but that your family would be producing a lawyer over at the police station, is that correct?

A. Right.

Q. Was anything else said at that point ***?

A. No."

The Brookfield police officers then took defendant to the Brookfield police station, where they arrived at about 7 p.m. At the police station, defendant was taken into a conference room and given *Miranda* warnings again. According to his uncontradicted testimony, defendant responded: "I would really not say anything until I have my lawyer." Thus, within a few hours at most, defendant had been given *Miranda* warnings at least twice, and on each occasion he asserted his constitutional right to counsel.

At that stage, an assistant State's Attorney, the supervisor in charge of felony review, arrived at the police station. According to his testimony, he ascertained that defendant "had been advised of his rights by the police officers per the Miranda Decision." Then, for no stated reason, he readvised defendant of "the same rights," and he resumed the interrogation of defendant.

The record indisputably manifests that the resumption of defendant's interrogation was not in any way initiated by defendant. It was plainly not at defendant's suggestion or request. According to the testimony of the assistant State's Attorney at the suppression hearing, here is what happened:

"Q. After giving the defendant his Miranda Rights and determining that he had been given those rights by the police officers what was the next conversation you had with the defendant?

A. I asked him if he wanted to make a statement at this

time to me. ***"

The assistant State's Attorney testified that defendant then stated that he would tell him what happened because he had been treated like a man. The assistant State's Attorney asked defendant if he wanted to see his lawyer first, and defendant replied, "[N]o, I'll tell you what happened now." Defendant then gave the assistant State's Attorney a statement and he reenacted the homicide. At the assistant State's Attorney's request, defendant reenacted the homicide again on videotape. The assistant State's Attorney told defendant that the videotape did not come out, and defendant agreed to videotape a reenactment a second time. The assistant State's Attorney showed defendant that nothing appeared on the screen when the first videotape was replayed. The assistant State's Attorney and defendant testified that the second taping was about the same as the first. However, the assistant State's Attorney also testified that the reenactment for the first videotaping "was the best." He testified that defendant was "more graphic and vivid" than he was in the reenactment for the second videotaping.

During pretrial proceedings, the State produced only the second videotape because, it claimed, it did not keep the first videotape. Defendant filed a motion to suppress the second videotape, which was denied. During the trial, the second videotape was admitted into evidence and played before the jury.

■ We conclude that the trial court erred in denying defendant's motion to suppress and in admitting the videotape into evidence. Since defendant had plainly invoked his right to counsel, the resumption of the custodial interrogation solely at the initiative of the assistant State's Attorney without defendant's counsel being present was a *per se* violation of the fifth amendment to the Constitution.[2] Therefore, all subsequent confessions, inculpatory statements and inculpatory videotape reenactments of the homicide which occurred before defendant had access to counsel were nullified and should not have been used as evidence against defendant. (See *Edwards v. Arizona*

---

[2]There is a significant distinction between the safeguards triggered by a request to remain silent and the assertion of one's right to counsel. There is no *per se* proscription of any subsequent further attempt to interrogate if the person being questioned has merely indicated a desire to remain silent. However, the interrogation must cease and cannot be subsequently resumed at the initiative of the State until an attorney is present if the person clearly asserted his right to counsel. Compare *Edwards v. Arizona* (1981), 451 U.S. 477, 484-86, 68 L. Ed. 2d 378, 386-87, 101 S. Ct. 1880, 1884-85, with *Michigan v. Mosley* (1975), 423 U.S. 96, 101-04, 46 L. Ed. 2d 313, 320-21, 96 S. Ct. 321, 325-26.

(1981), 451 U.S. 477, 484-86, 68 L. Ed. 2d 378, 386-87, 101 S. Ct. 1880, 1884-85; *White v. Finkbeiner* (7th Cir. 1982), 687 F.2d 885; see also *Stumes v. Solem* (8th Cir. 1982), 671 F.2d 1150, *cert. granted* (1983), 463 U.S. ____, 77 L. Ed. 2d 1409, 103 S. Ct. 3568.) In *Edwards* the court stated:

> "*Miranda* itself indicated that the assertion of the right to counsel was a significant event and that once exercised by the accused, 'the interrogation must cease until an attorney is present.' 384 U.S., at 474. *** In *Fare v. Michael C., supra*, at 719, the Court referred to *Miranda*'s 'rigid rule that an accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights, requiring that all interrogation cease.' And just last Term, in a case where a suspect in custody had invoked his *Miranda* right to counsel, the Court again referred to the 'undisputed right' under *Miranda* to remain silent and to be free of interrogation 'until he had consulted with a lawyer.' *Rhode Island v. Innis*, 446 U.S. 291, 298 (1980). *We reconfirm these views and, to lend them substance, emphasize that it is inconsistent with Miranda and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel.*" (Emphasis added.) 451 U.S. 477, 485, 68 L. Ed. 2d 378, 386-87, 101 S. Ct. 1880, 1885.

In the present case, had defendant himself initiated his meeting and conversation with the assistant State's Attorney, nothing in the fifth amendment would have prohibited the assistant State's Attorney from merely listening to or recording defendant's voluntary, volunteered statement or reenactments of the homicide and using them against him at trial. (*Edwards v. Arizona* (1981), 451 U.S. 477, 485, 68 L. Ed. 2d 378, 387, 101 S. Ct. 1880, 1885.) But that is not what the facts in this case show. Rather, this case is squarely on all fours with *Edwards*, where the court stated:

> "Here, the officers conducting the interrogation on the evening of January 19 ceased interrogation when Edwards requested counsel as he had been advised he had the right to do. The Arizona Supreme Court was of the opinion that this was a sufficient invocation of his *Miranda* rights, and we are in accord. It is also clear that without making counsel available to Edwards, the police returned to him the next day. *This was not at his suggestion or request.* Indeed, Edwards informed the detention officer that he did not want to talk to anyone. At the meeting, the detectives told Edwards that they wanted to talk to him

and again advised him of his *Miranda* rights. Edwards stated that he would talk, but what prompted this action does not appear. He listened at his own request to part of the taped statement made by one of his alleged accomplices and then made an incriminating statement, which was used against him at his trial. We think it is clear that Edwards was subjected to custodial interrogation on January 20 within the meaning of *Rhode Island v. Innis, supra,* and that this occurred at the instance of the authorities. His statement, made without having had access to counsel, did not amount to a valid waiver and hence was inadmissible." (Emphasis added.) 451 U.S. 477, 486-87, 68 L. Ed. 2d 378, 387-88, 101 S. Ct. 1880, 1886.

In the present case, not only are the principles established in *Edwards* applicable, but the present case also plainly demonstrates why such principles are necessary and must be judicially enforced. Here, although the assistant State's Attorney knew that defendant had been given *Miranda* warnings and that he had been repeatedly asserting his constitutional right to counsel before being interrogated, the assistant State's Attorney again advised defendant of his constitutional rights and then asked defendant if he wanted *to give him* a statement.

■ No reason is given why it was necessary within a matter of two hours to readvise defendant of his right to remain silent and his right to counsel. The only apparent reason that the assistant State's Attorney readvised defendant of his rights was to euchre a waiver of defendant's constitutional right to counsel. (See *Edwards v. Arizona* (1981), 451 U.S. 477, 487, 68 L. Ed. 2d 378, 387-88, 101 S. Ct. 1880, 1886; *Brewer v. Williams* (1977), 430 U.S. 387, 399, 51 L. Ed. 2d 424, 436-37, 97 S. Ct. 1232, 1240.) Plainly, one's constitutional right to counsel during custodial interrogation cannot be so tenuous that it can be circumvented by the ploy of having an array of personalities repeatedly give *Miranda* warnings to a suspect who has asserted his right to counsel until the suspect has a different reaction to a particular, perhaps more sophisticated, interrogator and gives a different response. Rather, we believe that one's constitutional right to counsel during custodial interrogation is so substantial that once a suspect asserts his right to counsel, the State cannot on its own initiative readvise him of his rights to remain silent or to counsel unless it has some demonstrable and valid reason for doing so, and if it has none, then any subsequent inculpatory statement or recording by the suspect before he has access to counsel would be unconstitutionally obtained. (See *Edwards v. Arizona* (1981), 451 U.S. 477, 484-87, 68 L. Ed. 2d

378, 386-88, 101 S. Ct. 1880, 1884-86; *Oregon v. Bradshaw* (1983), 462 U.S. 1039, 1044, 77 L. Ed. 2d 405, 411, 103 S. Ct. 2830, 2834.) We also believe that once a person requests counsel during custodial interrogation, he may not be reinterrogated at the initiative of the State as to any related or unrelated offense until an attorney is present. (*State v. Routhier* (1983), 137 Ariz. 90, ___, 669 P.2d 68, 74-76; *Offutt v. State* (1983), ___ Md. App. ___, ___, 467 A.2d 194, 195.) Constitutional rights should not be the subject of gamesmanship. Nor should they be the subject of an endurance test.

Moreover, we, as judges, must be most circumspect when it appears that a dissimulation[3] has been employed to deprive a person of his right to counsel, for those affected are invariably the poorest, the weakest and the least educated, who are not sophisticated enough to realize the protection afforded by the great rights and guarantees of our constitution. If our constitutional rights and guarantees are to be in fact enjoyed equally by all our citizens, we, as judges, must ensure that those suspected of crimes do not relinquish their constitutional rights and guarantees solely because they become matched up against a more sophisticated but uncaring law enforcement officer, or an overzealous assistant State's Attorney who may be bent on obtaining a conviction without regard to the suspect's constitutional rights and guarantees. In this regard, we should bear in mind that " '*** the efficiency of the rack and the thumbscrew can be matched, given the proper subject, by more sophisticated modes of "persuasion." ' " *Brewer v. Williams* (1977), 430 U.S. 387, 408, 51 L. Ed. 2d 424, 442, 97 S. Ct. 1232, 1244 (Marshall, J., concurring), quoting *Blackburn v. Alabama* (1960), 361 U.S. 199, 206, 4 L. Ed. 2d 242, 247-48, 80 S. Ct. 274, 279.

Here, defendant was a 41-year-old black high school dropout who had repeatedly asserted his constitutional right to counsel during custodial interrogation. By resuming the custodial interrogation and making defendant feel "like a man," the assistant State's Attorney was able to get defendant to reenact the homicide on three separate occasions, and he videotaped two of the reenactments for subsequent use against defendant at trial. All this took place on a Sunday evening without defendant's counsel being present after defendant had told police that "my people will have a lawyer out there. Probably Monday

---

[3]In a custodial setting, the use of ploys and other techniques of persuasion, no less than express questioning, amounts to interrogation. *Rhode Island v. Innis* (1980), 446 U.S. 291, 299, 64 L. Ed. 2d 297, 306-07, 100 S. Ct. 1682, 1688-89; see *Stumes v. Solem* (8th Cir. 1982), 671 F.2d 1150, *cert. granted* (1983), ___ U.S. ___, 77 L. Ed. 2d 1409, 103 S. Ct. 3568.

because today is Sunday and I don't think I can reach my lawyer on a Sunday."[4]

We can neither affirm nor condone what was done by the assistant State's Attorney in this case because we believe that he violated defendant's fifth amendment right to have counsel present during custodial interrogation, and that he took advantage of the constitutional violation by expeditiously conducting videotaped reenactments of the homicide before defendant had access to counsel. What occurred contravenes the constitutional rights of the accused as set forth in *Edwards*, and it is inimical to the basic dictates of a fair criminal justice system. As for the State's claim that defendant waived his constitutional right to counsel, that claim is untenable. The statements relied upon by the State, which appear earlier in this opinion, were made by defendant in conjunction with a resumed custodial interrogation initiated solely by the assistant State's Attorney without defendant having had access to counsel after he had clearly and repeatedly asserted his right to counsel. (See *Edwards v. Arizona* (1981), 451 U.S. 477, 484-87, 68 L. Ed. 2d 378, 386-88, 101 S. Ct. 1880, 1884-86.) Waiver is simply not involved in this case. See *Oregon v. Bradshaw* (1983), 462 U.S. 1039, 1044, 77 L. Ed. 2d 405, 412, 103 S. Ct. 2830, 2834-35.

Accordingly, we conclude that defendant's conviction must be reversed and defendant granted a new trial in which the State is precluded from taking advantage of all matters that occurred in the absence of defendant's counsel from the first time that defendant exercised his constitutional right to counsel before the police officers.

■ In addition, we conclude that defendant's conviction must be reversed and the case remanded for a new trial because of the admission of the second videotape into evidence after the State failed to produce the first videotape, which was requested by defendant's counsel. On this point, we should bear in mind that defendant admits committing the homicide. The question is whether the homicide was murder, voluntary manslaughter or self-defense.

In this regard, a seasoned attorney would know that an expression of fear, excitement or calmness, or an inadvertent or thoughtless, casual leaning or placement of one's body in a certain way during the reenactment of a homicide could be the crucial difference between a finding of murder, voluntary manslaughter or self-defense. Therefore, we find it significant that the only attorney who was present during the two videotapings of the reenactments of the homicide was the as-

---

[4]The notice given to the police is imputed to the assistant State's Attorney. See *People v. White* (1975), 61 Ill. 2d 288, 294, 335 N.E.2d 457, 461.

sistant State's Attorney, and he did not keep the first tape because, he claims, it did not come out. His action, of course, meant that the first videotape would not be available later for examination by defendant's counsel.

We believe that the assistant State's Attorney, who was in charge of felony review, should have been aware of the potential importance of the first tape. The State's explanation for the unavailability of the missing tape is simply too convenient an excuse in a case where one's liberty is at stake. Moreover, we do not feel that the significance of the missing tape is diminished by statements that defendant was shown the tape that Sunday evening or by the testimony that the two tapings were about the same, since the record establishes that defendant did not know anything about cameras or videotapes. Indeed, the fact that defendant did not have any knowledge of cameras or videotapes demonstrates one of the reasons why it was so important that defendant have had access to counsel prior to the tapings. Ours is an adversary criminal justice system, and we should not pretend that it is otherwise. The stark realities of our adversary criminal justice system are such that what occurs within the confines of a police station during custodial interrogation when the suspect does not have an attorney present is not always what the unsophisticated would expect. See *Miranda v. Arizona* (1966), 384 U.S. 436, 448-58, 16 L. Ed. 2d 694, 708-14, 86 S. Ct. 1602, 1614-19; *Brewer v. Williams* (1977), 430 U.S. 387, 399, 51 L. Ed. 2d 424, 436-37, 97 S. Ct. 1232, 1240.

Under the circumstances, we believe that the State was charged with the safekeeping of the first tape, and that it was not for the assistant State's Attorney on that Sunday evening in the police station to determine whether there was anything on the first tape which would have been beneficial to defendant. Since the State was charged with the safekeeping of both tapes and it did not fulfill its obligation, the State, rather than defendant, should suffer the consequences of its negligent or wilful destruction of the missing tape. Accordingly, we conclude that the State should have been precluded from putting the second tape into evidence. It is unrealistic to believe that any lesser restraint upon the State would have any meaningful effect.

For the reasons stated, we reverse the conviction and remand the case for a new trial. We do not reach the other issues raised by the defendant except the issue of whether the evidence admitted at trial was sufficient for a jury to conclude that defendant was guilty beyond a reasonable doubt. We have reviewed all of the evidence, and we conclude that the evidence admitted at trial was sufficient for a jury to conclude that defendant was guilty beyond a reasonable doubt. This

does not mean that we are making a finding as to defendant's guilt or innocence which will be binding on retrial, but rather, our consideration of the sufficiency of the evidence admitted at trial will protect defendant's constitutional right against double jeopardy. See *People v. Taylor* (1979), 76 Ill. 2d 289, 309-10, 391 N.E.2d 366, 375.

Accordingly, the judgment is reversed, and this case is remanded for a new trial.

Reversed and remanded.

McNAMARA and McGILLICUDDY, JJ., concur.