THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES CURTIS *et al.*, Defendants-Appellants.

First District (3rd Division)   Nos. 83—2339, 83—2395 cons.

Opinion filed March 29, 1985.

McNAMARA, J., dissenting.

James L. Hardemon and Wilson Frost, both of Chicago, for appellant James Curtis.

Patrick A. Tuite, of Chicago, for appellant Andrew Ryder.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Timothy J. Joyce, and Brian S. Crowley, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:

Defendants James Curtis and Andrew Ryder were found guilty of armed robbery in a bench trial. We reverse the convictions and remand for a new trial because of the violation of defendants' sixth amendment right to counsel after adversarial judicial proceedings had been initiated against them and because of the exploitation of the results of that constitutional violation at trial.

On July 18, 1979, two men entered a liquor store at about 10 p.m., near closing time. They pretended to be customers and then wielded guns and removed a gun from a part-time security guard, Fred Kennie. They also took money and checks from the store manager, Thomas Buckle, a cashier, Rosalind Harris, and another employee, Gregory Webb. The entire incident lasted from 15 minutes to a half hour. After the robbery, the police were called and Buckle related that the robbers were a white man and a black man. Buckle also gave a general description of the robbers to the police.

Nineteen months later, in early February of 1981, Kennie informed the police that he was a participant in the robbery and that his accomplices were defendants Ryder and Curtis. On February 10, 1981, two arrays of five photographs were shown to Buckle. One array included a photograph of Ryder, and the other array included a photograph of Curtis. According to the testimony of a police officer, Buckle made a tentative identification of Ryder from the first array. The same police officer testified, however, that Buckle was not sure and that, in effect, he wanted to see the man in the photograph in person before he made a positive identification. After looking at the second array of five photographs Buckle said, "this one here resembled" Curtis.

On February 11, 1981, an array of five photographs, which included a photograph of Ryder, was shown to Harris. She stated that the photograph of Ryder "looked like the guy" she saw in the store. After being shown another array of five photographs, which included a photograph of Curtis, she stated, "I thought this was the picture of the black guy."

On February 17, 1981, felony complaints were prepared and submitted before a judge of the circuit court, naming Ryder and Curtis as defendants. The complaints charged defendants with armed robbery. After conducting a hearing, the judge determined that there was probable cause for filing the complaints. He gave the assistant State's Attorney leave to file the complaints, and he issued arrest warrants.

At about 5 p.m. on the same day, Ryder was arrested pursuant to the warrant and taken to the area police station. He requested an at-

torney and declined to give a statement until he talked to his attorney. He telephoned his attorney, and he was told not to give any statements. Also, Ryder's attorney testified that he told a police officer on the telephone that he was in the process of working on another matter, but that he would appear at the police station and represent Ryder and he would attend a proposed lineup involving Ryder. About an hour and 15 minutes later, around 8:30 p.m., before the attorney arrived at the police station and without a waiver from Ryder, a lineup which included Ryder was conducted at the police station. Ryder's attorney appeared at the police station at 11 p.m., but the lineup had already taken place.

At the lineup, Buckle identified Ryder as one of the robbers. Ryder was the only person in the lineup who was in the array of five photographs that had been shown to Buckle seven days earlier on February 10, 1981.

Curtis was also arrested on February 17, 1981. After his arrest, he was taken to the same area police station but he did not arrive there until about 6:45 p.m. At the police station, when he was read his *Miranda* warnings and asked if he wanted to give a statement, he said: "I told them no, until I see my attorney." When he was asked if he wanted to call an attorney, he said: "I told them I had three attorneys and I didn't know which one to call at that time of night, whether they'd be in the office or not." Later, he attempted to call two of the lawyers but he was not able to reach them because no one answered the phone calls. About one-half hour to one hour later, Curtis was taken to a room where he was told, "[Y]ou're going to have to be in a lineup and *** to stand where I wanted to." Curtis did not voluntarily participate in the lineup. He was told he "had to stand the lineup."

At the lineup, Buckle told the police that Curtis "resembled the man." At no time did Curtis tell anyone that he did not want an attorney or that he waived his right to an attorney. An assistant State's Attorney was present during the lineup involving Curtis, as well as during the lineup involving Ryder.

The police officer who arrested Curtis testified that after he read Curtis the *Miranda* warnings in an interview room at the police station, the following occurred:

"A. I told him there is going to be a lineup in about an hour or two and that there'd be several people viewing the lineup and he had the right to contact an attorney.

Q. What did he say to that?

A. He stated he had three attorneys and didn't know which

one he wanted to call, and I offered him the phone to call all three if he wished.

Q. What did he say to that?

A. He stated he wanted to wait and see what happened. Meaning, I assume, he meant after the lineup. I don't know.

Q. Okay. So did he make any calls at that time?

A. He did make some phone calls.

Q. Do you know who to?

A. No.

Q. Did he tell you anything after that?

A. No.

Q. Okay. By the way, did he indicate whether he wanted to give any statement when you advised him of his Miranda warnings?

A. Right after he was advised of his rights he declined to give any statement at all."

Curtis was then taken to another room. While he was in that room, a second police officer stepped inside the room and began conversing with Curtis. As to what occurred, the police officer testified:

"Q. What, if anything, did he say to you, what, if anything did you say to him?

A. I believe, first, I remarked about not looking like his picture. And, I told him who I was. And, I was working on the case. And, I asked him if he had been advised of his rights.

He said he had. And, he had already been advised of his rights. And, I told him that Mr. Ryder had been arrested. And also that Mr. [Kennie] had been arrested in this matter. And that he would have to stand a line-up. And, I asked him if he had an Attorney. And, advised him that Mr. Ryder had an Attorney. And he said that he had three Attorneys.

Now, on the three Attorneys he had, he used them, apparently, in some business deals or what have you, before. But, he informed me that he did not want to make a phone call. And, did not want to talk to one of the Attorneys, because—as he said—he was "gonna play it by ear" at that time. And, he didn't know who he was going to use as an Attorney. Because he had three of them that he had dealt with in the past.

Q. So, did he make any phone calls, at all, in your presence?

A. He made no phone calls. At that time, I asked him did he want one and he did not."

On February 19, 1981, Harris, who had not attended the lineups, saw a picture of Ryder and Curtis in a newspaper which reported that

they had been arrested for the robbery. On February 23, 1981, police officers visited Harris and showed her photographs of the lineups that had been taken on February 17, 1981. She viewed the lineup photographs and stated that Curtis and Ryder were the "guys that [were] at the store."

The trial took place more than four years after the robbery. Except as stated, neither Buckle nor Harris had seen or viewed defendants in the interim period. At trial, defendants filed motions to suppress the lineup identifications that had been made by Buckle. The court allowed the motion to suppress as to Ryder on the basis that the lineup identification had occurred without assistance of counsel in violation of the sixth amendment. However, the court denied the motion to suppress as to Curtis on the basis that he had waived his right to assistance of counsel at the lineup.

At trial, over the objections of defendants, the court allowed Buckle and Harris to make in-court identifications of defendants. Defendants objected on the basis that the in-court identifications were the result of the unconstitutionally obtained lineup identifications and that, therefore, they should have been suppressed. In addition, over the objections of defendants, the prosecutor showed Harris the lineup photographs at trial, and Harris testified that she had seen the lineup photographs on February 23, 1981, and that she had identified defendants at that time. The lineup photographs were then admitted into evidence.

██ ▌ A critical issue in this case involves an accused's sixth amendment right "to have the Assistance of Counsel for his defence." (U.S. Const., amend. VI.) Specifically, defendants argue that their constitutional right to counsel at the lineups was violated and, therefore, the lineup evidence and the in-court identifications of defendants at trial should have been suppressed. The State counters that the lineup evidence and the in-court identifications were proper "as no right to counsel had attached at the time of the lineup[s] since no adversarial [judicial] proceedings had been initiated."[1]

---

[1]This case involves defendants' sixth amendment right to counsel and not their fifth amendment right to counsel. One's fifth amendment right to counsel comes into existence during custodial interrogation. Its purpose is to protect a citizen from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature. Here, neither the lineups nor anything that defendants were required to do in the lineups violated their privilege against self-incrimination. See *United States v. Wade* (1967), 388 U.S. 218, 221-27, 18 L. Ed. 2d 1149, 1154-58, 87 S. Ct. 1926, 1929-32; *People v. Martin* (1984), 102 Ill. 2d 412, 419, 466 N.E.2d 228, 231.

In addressing the issue, we first observe what the United States Supreme Court said in *Gilbert v. California*: "We there held [in *United States v. Wade* (1967), 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926] that a post-indictment pretrial lineup at which the accused is exhibited to identifying witnesses is a critical stage of the criminal prosecution; that police conduct of such a lineup without notice to and in the absence of his counsel denies the accused his Sixth Amendment right to counsel and calls in question the admissibility at trial of the in-court identifications of the accused by witnesses who attended the lineup." *Gilbert v. California* (1967), 388 U.S. 263, 272, 18 L. Ed. 2d 1178, 1186, 87 S. Ct. 1951, 1956.

Subsequent to the *Gilbert* decision, the United States Supreme Court decided *Kirby v. Illinois* (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877. In *Kirby*, the court held that an accused's sixth amendment right to counsel attaches at or after the time that adversarial judicial proceedings have been initiated against him "by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois* (1972), 406 U.S. 682, 689, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1882, quoted in *Moore v. Illinois* (1977), 434 U.S. 220, 226, 54 L. Ed. 2d 424, 432, 98 S. Ct. 458, 464. See also *United States v. Gouveia* (1984), 467 U.S. 180, 187-88, 81 L. Ed. 2d 146, 153-54, 104 S. Ct. 2292, 2297; *People v. Martin* (1984), 102 Ill. 2d 412, 419, 466 N.E.2d 228, 231.

With this background, we focus on the question of whether at the time of the lineups in the present case, adversarial judicial proceedings had already been initiated against defendants "by way of formal charge." We believe that the answer lies in an examination of the standard criminal procedures that are followed in Illinois and which were followed in this case.

Prosecutions are commenced by a complaint, an information, or an indictment. (Ill. Rev. Stat. 1983, ch. 38, par. 111—1.) When an arrest warrant is sought in a felony case, a felony complaint is presented by an assistant State's Attorney to a judge in the circuit court. In addition to naming the State as the plaintiff, the felony complaint names the accused as a defendant and charges that he has committed a specified felony offense. The judge must examine under oath the complainant and any witnesses presented by the assistant State's Attorney. If it appears to the judge, from his examination of the complainant and witnesses presented by the assistant State's Attorney and the contents of the complaint, that the person charged committed the offense, the judge will approve the filing of the complaint naming the person charged as the defendant, and the judge will issue a war-

rant for the defendant's arrest.[2] Ill. Rev. Stat. 1983, ch. 38, par. 107—9.

Plainly, after the complaint is filed, the person charged has ceased being merely an accused, and he has, in fact, in every respect become a formal defendant in need of an attorney to protect his interests as a citizen at any subsequent critical stage of the criminal proceedings that are brought against him by the State. Here, we must also bear in mind that it is after this stage that the defendant may file motions to suppress or to quash the formal charges that are made against him in the complaint.[3] Also, we note that "a complaint" is expressly included in the Code of Criminal Procedure of 1963 under sections entitled "Form of charge" (Ill. Rev. Stat. 1983, ch. 38, par. 111—3), and "Formal defects in a charge" (Ill. Rev. Stat. 1983, ch. 38, par. 111—5). Thus, it would be incongruous to conclude that after a felony complaint is judicially approved and filed in the circuit court, adversarial judicial proceedings have not been commenced against a defendant "by way of formal charge." See *Moore v. Illinois* (1977), 434 U.S. 220, 226, 54 L. Ed. 2d 424, 432, 98 S. Ct. 458, 464, quoting *Kirby v. Illinois* (1972), 406 U.S. 682, 689, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1882.

Accordingly, we believe that adversarial judicial proceedings by way of formal charge in felony cases commence after the filing of a felony complaint in the circuit court.[4] If it were otherwise, the use of the pertinent term "formal charge" in *Kirby* to designate when adversarial judicial proceedings have been initiated would be meaningless, for the term would not be distinguished from "preliminary hearing, indictment, information, or arraignment." *Moore v. Illinois* (1977), 434 U.S. 220, 226, 54 L. Ed. 2d 424, 432, 98 S. Ct. 458, 464, quoting *Kirby v. Illinois* (1972), 406 U.S. 682, 689, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1882.

Under the circumstances, since we believe that adversarial judicial proceedings had already been initiated against defendants before the lineups took place, we conclude that their sixth amendment right to assistance of counsel had already attached at the time of the lineups.

---

[2]In the present case, the judge subscribed to the following statement on the face of the felony complaints: "I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there is probable cause for filing same. Leave is given to file said complaint."

[3]The felony complaint that is filed in court after a judicial hearing and approval also serves as the basis for the preliminary hearing upon which the State's Attorney signs and files an information if there is probable cause. Ill. Rev. Stat. 1983, ch. 38, pars. 109—3, 111—3.

[4]But see *People v. Boswell* (Mar. 14, 1985), No. 83—169.

This being so, defendants had a constitutional entitlement to the presence of counsel at the lineups because it is firmly established that a lineup is a critical stage of the criminal proceedings against a defendant. *United States v. Wade* (1967), 388 U.S. 218, 227-37, 18 L. Ed. 2d 1149, 1157-63, 87 S. Ct. 1926, 1932-38; *Gilbert v. California* (1967), 388 U.S. 263, 272, 18 L. Ed. 2d 1178, 1186, 87 S. Ct. 1951, 1956; *Moore v. Illinois* (1977), 434 U.S. 220, 229-32, 54 L. Ed. 2d 424, 434-36, 98 S. Ct. 458, 465-66.

As to Ryder, he was placed in a lineup without having counsel present to protect his interests at the lineup. Thus, the trial court properly suppressed the pretrial lineup identification of him that was made by Buckle.

■ As to Curtis, the trial court ruled that he waived his constitutional right to assistance of counsel at the lineup. We disagree. A waiver is an intentional abandonment of a known right. *Johnson v. Zerbst* (1938), 304 U.S. 458, 464, 82 L. 2d 1461, 1466, 58 S. Ct. 1019, 1023; *People v. Swift* (1980), 91 Ill. App. 3d 361, 364, 414 N.E.2d 895, 898.) This precept must be applied here with utmost scrutiny, for fundamental constitutional rights, such as the right to assistance of counsel, were paid for too dearly to be lost unwittingly by any citizen. Thus, before we can conclude that Curtis intelligently waived his constitutional right to assistance of counsel at the lineup, we must determine whether he knew of the existence of that right in a very real sense. Accordingly, we must determine whether he knew under the circumstances in which he found himself that the police could not demand that he appear at the lineup without assistance of counsel.

The circumstances under which Curtis found himself are not common to the average citizen.[5] He was under arrest and at a police station between the hours of 7 and 8 p.m. When he was given *Miranda* warnings, he responded by saying that he did not want to give a statement until "I see my attorney." A police officer testified that after Curtis was advised of his rights, "he declined to give any statement at all." Curtis had three lawyers who had represented him in business matters in the past, but he did not know which one to call at

---

[5]The record reflects that Curtis had no previous convictions, and the transcript of the sentencing hearing suggests that he has steady employment, strong familial ties and no history of serious criminality. In sentencing Curtis, the trial judge imposed the statutory minimum sentence of six years. In *Johnson v. Zerbst* (1938), 304 U.S. 458, 464, 82 L. Ed. 1461, 1466, 58 S. Ct. 1019, 1023, the court held that "the background, experience, and conduct of the accused" in each case is to be taken into consideration in determining "whether there has been an intelligent waiver of the right to counsel."

that time of night because they probably would not be in their offices. The police officer told Curtis that he was going to have to be part of a lineup and that "he had the right to contact an attorney." The police officer stated that when he offered Curtis the phone to call his attorneys, Curtis said that he wanted to wait and see what happened. Curtis then called two of the lawyers that had represented him in the past, but no one answered the phone calls. Later, Curtis was taken to another interview room, where a second police officer told him "that he would have to stand a line-up." It is unrebutted that all of this happened after Curtis had unequivocally told the police that he did not want to give any statement until he saw his lawyer.[6] The second police officer then asked Curtis if he had an attorney, and Curtis told him that he had three attorneys, but did not know which one he was going to use and he would "play it by ear" at that time. This response by Curtis was made after he had already phoned two attorneys but was not able to reach them because it was nighttime, and they were not in their offices.

In its argument to establish a waiver of counsel, the State relies upon the first police officer's statement that when he offered Curtis the phone to call his attorneys, Curtis said that he wanted to wait and see. The State also relies upon the second police officer's statement that Curtis said he was "gonna play it by ear." However, the crucible for determining whether there was a waiver of one's constitutional right to counsel is plainly not solely the words attributed to a defendant by a police officer. (See *People v. Dailey* (1972), 51 Ill. 2d 239, 241, 282 N.E.2d 129, 130.) Here, Curtis' words were not uttered in a vacuum, and we should not view them in that manner. Rather, we must look to the facts and circumstances surrounding his words to determine whether he uttered them as an intentional abandonment of a constitutional right that was known to him.

In this regard, since the right to assistance of counsel is a fundamental constitutional right, we must indulge in every reasonable presumption that Curtis did not waive the right, and we cannot presume acquiescence in the loss of the right.[7] (*Johnson v. Zerbst* (1938), 304

---

[6]Knowledge of Curtis' previous statement to the police that he did not want to give any statement until he saw his lawyer is imputed to the second police officer. See *People v. Hammock* (1984), 121 Ill. App. 3d 874, 881 n.4. 460 N.E.2d 378, 383 n.4, citing *People v. White* (1975), 61 Ill. 2d 288, 294, 335 N.E.2d 457, 461.

[7]On this point, we note with interest that three justices presently sitting on the United States Supreme Court support the position that only an express and specific waiver of the right to counsel will justify a loss of the constitutional right. (*North Carolina v. Butler* (1979), 441 U.S. 369, 377-79, 60 L. Ed. 2d 286, 294-96, 99 S. Ct.

U.S. 458, 464, 82 L. Ed. 1461, 1466, 58 S. Ct. 1019, 1023.) Moreover, although the trial court need not be convinced beyond a reasonable doubt when considering the issue of waiver, we must bear in mind that the State has the burden of proof on the issue. (*People v. Swift* (1980), 91 Ill. App. 3d 361, 364, 414 N.E.2d 895, 898.) The State's burden to establish a waiver of the right to counsel has been described as a "heavy burden." *People v. Taylor* (1979), 76 Ill. 2d 289, 310-11, 391 N.E.2d 366, 375-76.

In the present case, we believe the facts plainly manifest that under the circumstances in which he found himself, Curtis did not know that the police could not demand that he appear at the lineup without assistance of counsel. Rather, it was made to appear as if his participation in the lineup that night, with or without counsel, was inevitable. We also believe that the facts and circumstances surrounding Curtis' answers to the police officers strongly militate against the conclusion that Curtis intentionally abandoned a constitutional right that was known to him. (*Cf. Johnson v. Zerbst* (1938), 304 U.S. 458, 82 L. Ed. 1461, 58 S. Ct. 1019; *People v. Swift* (1980), 91 Ill. App. 3d 361, 414 N.E.2d 895; *People v. Taylor* (1979), 76 Ill. 2d 289, 391 N.E.2d 366.)[8] Thus, applying the waiver principles to the facts before us, we conclude that the trial court's ruling that Curtis waived his constitutional right to counsel at the lineup is against the manifest weight of the evidence. See *People v. Martin* (1984), 102 Ill. 2d 412, 426, 466 N.E.2d 228, 234.

In addition, before the conversations on which the State relies to establish a waiver took place, Curtis had already told the police that

---

1755, 1759-60 (Brennan, J., dissenting, joined by Marshall and Stevens, JJ.).) In his dissent, Justice Brennan states: "[T]he requirement of an express waiver would impose no burden on the police not imposed by the Court's interpretation. It would merely make that burden explicit. Had Agent Martinez simply elicited a clear answer from Willie Butler to the question, 'Do you waive your right to a lawyer?' this journey through three courts would not have been necessary." 441 U.S. 369, 379, 60 L. Ed. 2d 286, 296, 99 S. Ct. 1755, 1760. But see *People v. Martin* (1984), 102 Ill. 2d 412, 425, 466 N.E.2d 228, 234: "This court has held that a valid relinquishment of the right to counsel is not dependent on an express waiver."

[8]The *Johnson* and *Swift* cases involve a claim of waiver of one's right to counsel under the sixth amendment. There is authority to support the position that there is a higher standard that must be met to show a waiver of one's sixth amendment right to counsel than to show a waiver of one's fifth amendment right to counsel. (*Wyrick v. Fields* (1982), 459 U.S. 42, 52-55, 74 L. Ed. 2d 214, 221-24, 103 S. Ct. 394, 398-400 (Marshall, J., dissenting).) However, there is also authority to support the position that the standard that must be met to show a waiver of one's right to counsel is the same under the fifth and sixth amendments. See *People v. Owens* (1984), 102 Ill. 2d 88, 102, 464 N.E.2d 261, 267.

he did not want to give any statements until he saw his lawyer. In our view, once Curtis asserted his right to counsel, the police were obligated not to initiate any conversation with him concerning a critical stage of the criminal proceedings against him until he had a reasonable time to make contact with his counsel, or at the very least, until he was furnished with substitute counsel. (See *United States v. Wade* (1967), 388 U.S. 218, 237, 18 L. Ed. 2d 1149, 1163, 87 S. Ct. 1926, 1937-38.) Instead, after Curtis had asserted his right to counsel, the police readied him for the lineups and initiated the conversations with him on which the State relies to establish a waiver of assistance of counsel. We believe that the conversations were improperly initiated by the police. By way of comparison, in a fifth amendment right to counsel setting, the United States Supreme Court held that once a suspect in custody asserts his right to counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." (*Edwards v. Arizona* (1981), 451 U.S. 477, 484-85, 68 L. Ed. 2d 378, 386, 101 S. Ct. 1880, 1884-85; see also *Smith v. Illinois* (1984), 469 U.S. 91, 83 L. Ed. 2d 488, 105 S. Ct. 490.) If the authorities initiate further communications, exchanges, or conversations with the defendant, any information or waiver resulting therefrom would be unconstitutionally obtained. (*People v. Hammock* (1984), 121 Ill. App. 3d 874, 879-80, 460 N.E.2d 378, 382.) We see no reason why the pertinent rationale and holdings in *Edwards* and *Smith* should not apply in a sixth amendment right to assistance of counsel setting in regard to communications, exchanges, or conduct involving a critical stage of the criminal proceedings against the defendant. Rights and guarantees afforded by the Bill of Rights cannot be made the subject of an endurance test. (See *People v. Smith* (1984), 102 Ill. 2d 365, 378, 466 N.E.2d 236, 242 (Simon, J., dissenting), *majority rev'd sub nom. Smith v. Illinois* (1984), 469 U.S. 91, 83 L. Ed. 2d 488, 105 S. Ct. 490; *People v. Hammock* (1984), 121 Ill. App. 3d 874, 879-80, 460 N.E.2d 378, 382-83.) This fact can be stated judicially without reservation, for it is plainly ingrained in our American ideals.

Accordingly, not only do we conclude that the trial court's ruling that Curtis waived his constitutional right to assistance of counsel at the lineup is against the manifest weight of the evidence, but we also conclude that under the circumstances any waiver of that right would have been unconstitutionally obtained. *Cf. Edwards v. Arizona* (1981), 451 U.S. 477, 484-85, 68 L. Ed. 2d 378, 386-87, 101 S. Ct. 1880, 1884-85; *People v. Hammock* (1984), 121 Ill. App. 3d 874, 879-80, 460 N.E.2d 378, 382-83.

■ Next, the State, relying upon *Wade*, takes the position that even if defendants' constitutional right to counsel was violated at the lineup and there was no waiver, no error occurred at trial because there was an independent basis for the in-court identifications made by Buckle and Harris. In *Wade*, the court held that if the prosecution established by clear and convincing evidence that the in-court identification is based upon observations of the suspect other than from the lineup identification, then the in-court identification is permissible. (*United States v. Wade* (1967), 388 U.S. 218, 239-42, 18 L. Ed. 2d 1149, 1164-66, 87 S. Ct. 1926, 1939-40.) However, in *Wade*, unlike the present case, the prosecution did not elicit from the witnesses the fact that they had identified the defendant at the lineup, and there was no evidence of the lineup itself introduced at trial. See *Moore v. Illinois* (1977), 434 U.S. 220, 225-26, 54 L. Ed. 2d 424, 431-32, 98 S. Ct. 458, 463.

Here, the prosecutor opportunistically elicited testimony from Buckle that he had identified defendants at the lineups, which were held in violation of defendants' constitutional rights. Moreover, the prosecutor showed Harris the lineup photographs at trial and elicited testimony from Harris that she had seen the lineup photographs on February 23, 1981, and identified defendants at that time from the lineup photographs. The lineup photographs were then admitted into evidence. Plainly, this testimony and evidence were the direct results of the unconstitutional lineups, obtained by the prosecutor's exploitation of the primary illegality. The testimony and evidence should therefore have been prohibited without regard to whether the prosecution was able to prove that the pretrial identifications or the in-court identifications had an independent source.

Moreover, only a *per se* exclusionary rule as to such testimony and evidence can be an efficacious sanction to assure that law enforcement authorities will respect an accused's constitutional right to assistance of counsel at all critical stages after adversarial judicial proceedings have been commenced against him. (*Moore v. Illinois* (1977), 434 U.S. 220, 231-32, 54 L. Ed. 2d 424, 435-36, 98 S. Ct. 458, 466; *Gilbert v. California* (1967), 388 U.S. 263, 272-74, 18 L. Ed. 2d 1178, 1186-87, 87 S. Ct. 1951, 1956-57.) Thus, in the present case, the State was not entitled to show that the testimony and other evidence of the pretrial identifications, or the in-court identifications, had an independent source.

Under the circumstances, a question arises as to whether we are able to declare a belief that the violation of defendants' sixth amendment right to assistance of counsel was harmless beyond a reasonable doubt. (*Chapman v. California* (1967), 386 U.S. 18, 24, 17 L. Ed. 2d

705, 710-11, 87 S. Ct. 824, 828; *Moore v. Illinois* (1977), 434 U.S. 220, 232, 54 L. Ed. 2d 424, 436, 98 S. Ct. 458, 466; *Gilbert v. California* (1967), 388 U.S. 263, 274, 18 L. Ed. 2d 1168, 1187, 87 S. Ct. 1951, 1957.) We conclude that we cannot make such a declaration.

In this regard, we first observe that Webb, who was present throughout the robbery and presumably could have made an identification of the robbers, was not called as a witness by the State. In addition, while Webb witnessed lineups which included defendants right after the lineup witnessed by Buckle on the night of February 18, 1981, the record is silent as to whether Webb identified either of the defendants at those lineups. Here, we note that although an assistant State's Attorney was present at the lineups, defendants did not have counsel present to observe or perhaps memorialize Webb's responses or reactions at the lineups.

Since the State did not call Webb as a witness, the only witness to identify defendants besides Buckle and Harris was Kennie. However, while Kennie's testimony may be true, it is subject to reasonable doubt. In February 1981, 19 months after the robbery, Kennie first named defendants as the robbers. At the time, in addition to his part-time security job at the liquor store, he was working full-time for the Chicago fire department as an emergency medical technician. He had worked for the Chicago fire department for 10 or 12 years. Kennie testified that in February 1981, Ryder was a captain in the Chicago fire department assigned to the Internal Affairs Division. Kennie also testified that in February 1981, he knew that Ryder and the IAD were investigating him for stealing money from dead people and sick people in fire department ambulances. Kennie testified that he knew that if the charges against him which Ryder was investigating at the time were proved, then he would lose his job with the Chicago fire department.

There are other aspects of Kennie's testimony that are worth noting. According to Kennie's own testimony, he had "an agreement with the People of the State of Illinois" relative to his testimony at trial. The agreement was that the State would recommend that he receive minimum concurrent sentences for an armed robbery charge and a forgery charge then pending against him. In addition, Kennie had a possession-of-controlled-substance charge pending, which, under Kennie's agreement with the State in the present case, the State would nol-pros or dismiss. Kennie's agreement with the State in the present case also included a disposition of two counts of deceptive practice charges pending against him for cashing worthless checks.

We believe that Kennie's agreements with the State relative to his testimony at trial, his history of criminality and the circumstances un-

der which his "cooperation" with the State arose seriously impugn his testimony and subject it to reasonable doubt.[9] Thus, in reality, this case may have hinged on the weight that was given to the identifications that were made by Buckle and Harris. As to these two witnesses, not only did the prosecutor expediently buttress their in-court identifications with the unlawful lineup identifications and the pretrial identifications that had been made with the use of the lineup photographs, but he also put into evidence the unlawful lineup photographs themselves. The prosecutor's wrongful enhancement of the identifications made by Buckle and Harris is clearly significant, because (1) neither Buckle nor Harris had ever seen defendants before the robbery, (2) more than 19 months had elapsed from the time of the robbery until Buckle and Harris first saw photographs of defendants, (3) Buckle and Harris' initial identifications from the photographs were not absolutely certain, according to the police officer, (4) Harris had seen photographs of defendants in a newspaper account of defendants' arrest for the robbery only four days before she identified defendants in the lineup photographs, and (5) except for the unlawful lineup identifications by Buckle 19 months after the robbery, neither Buckle nor Harris had seen defendants in person for more than four years, from the time of the robbery until the trial.

We conclude that for all of the reasons that we have stated, we cannot declare a belief that the violation of defendants' sixth amendment right to assistance of counsel at the lineups and the exploitation of that violation by the prosecutor were harmless beyond a reasonable doubt. Therefore, the convictions must be reversed.

One other issue is raised by defendants. They contend that the State failed in its burden to prove that the robbers were armed with dangerous weapons as required by the armed robbery statute. We find this contention to be totally without merit, and it does not warrant any discussion.

Accordingly, we reverse the convictions and remand the case for a new trial because of the violation of defendants' sixth amendment right to assistance of counsel after adversarial judicial proceedings had been initiated against them and because of the exploitation of the results of

---

[9]Compare *People v. Smith* (1982), 93 Ill. 2d 179, 190, 442 N.E.2d 1325, 1330, where the court stated: "Finally, the State argues that even if the statements should not have been admitted, admitting them was harmless error. Considering the record we cannot agree. *** Moreover, as the defendant points out, the only other evidence directly linking the defendant to the crimes was the testimony of Mary Smith, who pleaded guilty to armed robbery, and whose murder charges were dropped in exchange for her testimony."

that constitutional violation at trial.

Reversed and remanded.

McGILLICUDDY, J., concurs.

JUSTICE McNAMARA, dissenting:

I respectfully dissent from the majority's decision reversing defendants' convictions. The trial court correctly found that Curtis waived his constitutional right to counsel at the lineup and that the lineup and photographic identification procedures were not suggestive. There was also clear and convincing evidence presented to show that the in-court eyewitness identifications of both defendants were based on a source independent of the lineups. Accordingly, the trial court properly found that the testimony concerning the lineup identification of Curtis and the in-court identifications of both defendants was admissible at trial. I would affirm the convictions of both defendants.

An accused's sixth amendment right to counsel attaches at the commencement of adversarial judicial criminal proceedings. (*Moore v. Illinois* (1977), 434 U.S. 220, 54 L. Ed. 2d 424, 98 S. Ct. 458; *People v. Burbank* (1972), 53 Ill. 2d 261, 291 N.E.2d 161, *cert. denied* (1973), 412 U.S. 951, 37 L. Ed. 2d 1004, 93 S. Ct. 3017.) However, neither the United States Supreme Court nor our supreme court have decided whether sixth amendment rights attach upon the filing of a complaint and the issuance of an arrest warrant. Nevertheless, it is unnecessary to address this issue, because the trial court had ample proof to find that Curtis waived any right to counsel.

A waiver of counsel must be voluntary and must constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege. (*Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880.) A determination of waiver depends "upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." (*Johnson v. Zerbst* (1938), 304 U.S. 458, 464, 82 L. Ed. 1461, 1466, 58 S. Ct. 1019, 1023.) It is for the trial court to decide whether there has been a waiver of the right to counsel; the court need not be convinced beyond a reasonable doubt, and the court's decision will not be disturbed unless it is against the manifest weight of the evidence. (*People v. Dailey* (1972), 51 Ill. 2d 239, 282 N.E.2d 129.) Moreover, our supreme court has held that "a valid relinquishment of the right to counsel is not dependent upon an express waiver." *People v. Martin* (1984), 102 Ill. 2d 412, 425, 466 N.E.2d 228, *cert. denied* (1984), 469

U.S. 935, 83 L. Ed. 2d 270, 105 S. Ct. 334.

Before being placed in the lineup, Curtis was informed of his right to counsel at the lineup. The majority states that Curtis' statements as reported by the police officers that he wanted to "wait and see" before calling an attorney and that he did not wish to call an attorney before the lineup because he was "gonna play it by ear" do not indicate a waiver. Contrary to the majority's holding, the surrounding facts and circumstances and Curtis' background and conduct demonstrate that he knew he had a right to an attorney and waived that right.

When Curtis was initially advised of his right to counsel, the police testified that Curtis stated he had three lawyers, but did not want to call them. He had not made up his mind which attorney to call or if he was going to contact an attorney. After making two calls, Curtis stated that he would "play it by ear" and did not want to make a call or have an attorney present. He thereafter proceeded voluntarily to the lineup without an attorney. Although Curtis may have been unfamiliar with a station-house setting, he had a high school education and had served in the military. He had contact with attorneys in the past and was advised that this was a serious case. Curtis chose to deal with the authorities on his own and to make his own legal decisions. (See *Brewer v. Williams* (1977), 430 U.S. 387, 51 L. Ed. 2d 424, 97 S. Ct. 1232.) Curtis' background and experience demonstrate that he understood his right to counsel, and his language and conduct prior to the lineup show that he knowingly, intelligently and voluntarily waived this right.

The majority also asserts that, according to *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880, any police-initiated conversation with Curtis after he asserted his right to counsel was improper and should not be used as the basis for its finding. The United States Supreme Court has recently set forth its analysis of the fifth amendment right to counsel in *Smith v. Illinois* (1984), 469 U.S. 91, 83 L. Ed. 2d 488, 105 S. Ct. 490. Two distinct inquiries are necessary in determining a fifth amendment constitutional violation: whether the accused invoked his right to counsel and if so, whether the accused initiated further conversation with police and thereafter knowingly and intelligently waived his right. The fallacy in extending the fifth amendment *Edwards-Smith* analysis to a sixth amendment lineup is that the right to counsel in each instance exists to protect different constitutional rights. The fifth amendment right to counsel attaches to protect an accused from self-incrimination during custodial interrogation. (*Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880.) The sixth amendment right to counsel provides an attorney to assist an accused and insure fairness at the beginning of adver-

sary judicial proceedings. (*Kirby v. Illinois* (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877.) While an accused can assert his fifth amendment right and halt questioning, an accused cannot halt a police investigation or judicial proceeding.

Therefore, applying the *Edwards-Smith* proscription that police cannot initiate further questioning once a lawyer has been requested to a sixth amendment lineup setting is illogical and improper. (See *Rhode Island v. Innis* (1980), 446 U.S. 291, 64 L. Ed. 2d 297, 100 S. Ct. 1682.) It is entirely appropriate for police officers to again ask an accused if he wishes to call a lawyer or if he has contacted a lawyer, and if so, when the lawyer is expected to arrive. It would be impractical to prohibit any further inquiry concerning the request for a presence of an attorney at the anticipated lineup. The State should not have to wait until the accused initiates further conversation to determine if or when an attorney is coming. For sixth amendment lineup purposes, police officers should be able to make further inquiries concerning counsel without a constitutional violation.

Moreover, even if the *Edwards-Smith* rule did apply to a sixth amendment lineup setting, there is no clear and unequivocal indication that Curtis requested an attorney's presence at the lineup. When advised of his right to counsel, Curtis responded equivocally. His statements and conduct showed indecisiveness and do not demonstrate a clear request for counsel. (See *People v. Krueger* (1980), 82 Ill. 2d 305, 412 N.E.2d 537, *cert. denied* (1981), 451 U.S. 1019, 69 L. Ed. 2d 390, 101 S. Ct. 3009; *People v. Winston* (1982), 106 Ill. App. 3d 673, 435 N.E.2d 1327.) This is not to say that an accused must make two separate requests for counsel for fifth and sixth amendment purposes. The right to counsel is not dependent on a request by the defendant. (*Brewer v. Williams* (1977), 430 U.S. 387, 51 L. Ed. 2d 424, 97 S. Ct. 1232.) Courts, however, must engage in separate inquiries to determine constitutional violations of those rights. See *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880.

The majority concludes that, because of the sixth amendment violation, the State was not entitled to show either that the testimony and photographic evidence of pretrial identification or that the in-court identification had an independent source. The majority's conclusion is contrary to the interpretation of the *Wade-Gilbert* exclusionary rule. (See *Moore v. Illinois* (1977), 434 U.S. 220, 54 L. Ed. 2d 424, 98 S. Ct. 458.) Even if a lineup identification violates an accused's sixth amendment right, subsequent in-court identifications are still admissible if based on a source independent of and untainted by the lineup identifications. *United States v. Wade* (1967), 388 U.S. 218, 18 L. Ed. 2d 1149,

87 S. Ct. 1926; *People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489.

The record reveals that both Buckle and Harris had ample opportunity to view defendants the evening of the robbery. Buckle testified that the liquor store had fluorescent lighting and that defendants were in the store approximately 15 minutes. Buckle had face-to-face conversations with both defendants and observed them at a close distance while they removed money from the safe and cash registers. Immediately after the robbery, Buckle described the physical characteristics of the robbers to the police. Those descriptions substantially matched the actual descriptions of Curtis and Ryder. Buckle identified both defendants from an array of five photographs, one week before defendants' arrest and lineup.

Harris testified that she observed both defendants in the store prior to the actual robbery and that she was standing approximately five feet from the black man and seven feet from the white man. Harris also observed defendants during the 15-minute robbery and thereafter furnished a description to the police which matches defendants' actual descriptions. Harris viewed a photographic array and stated that defendants' photographs looked similar to those of the robbers.

The testimony of both witnesses reveals no discrepancy between any prelineup descriptions and defendants' actual descriptions nor any failure to identify defendants on a prior occasion. (*People v. Marshall* (1977), 47 Ill. App. 3d 784, 365 N.E.2d 367.) The trial court had ample evidence that the in-court identifications of defendants were based upon origins independent of the lineups and, therefore, the absence of defense counsel at the lineups does not require reversal on appeal. (*People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489; *People v. Giovanetti* (1979), 70 Ill. App. 3d 275, 387 N.E.2d 1071; *People v. Shorter* (1978), 59 Ill. App. 3d 468, 375 N.E.2d 513.) The fact that there were 20 months between the crime and the lineup identification by Buckle and identification from the lineup photographs by Harris is not determinative. In *People v. Martin* (1970), 47 Ill. 2d 331, 265 N.E.2d 685, *cert. denied* (1971), 403 U.S. 921, 29 L. Ed. 2d 700, 91 S. Ct. 2240, the court found that despite a time lapse of approximately two years between the robbery and photographic identifications and over three years between the crime and trial, the delay did not preclude independent observations.

I note also that, since Ryder's lineup identifications were suppressed by the trial court, Buckle did not testify that he had identified Ryder at the lineup. If there were any illegality connected with that

lineup identification of Ryder, it would have been dissipated by Buckle's observation of Ryder independent of the lineup. The fact that Harris stated that the photographs of each defendant "looked like" the men who robbed the store and did not make a positive identification until viewing the lineup photographs does not make her in-court identification less reliable. (See *People v. Anton* (1981), 100 Ill. App. 3d 344, 426 N.E.2d 1070.) Further, defendants make no contention that the lineups or photo identification procedures were unnecessarily suggestive, nor does the record so indicate. (See *Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243; *Simmons v. United States* (1968), 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967.) Additionally, the sixth amendment does not require that defense counsel be present when a witness views photographic arrays. (*United States v. Ash* (1973), 413 U.S. 300, 37 L. Ed. 2d 619, 93 S. Ct. 2568.) Therefore, both witnesses' testimony about the pretrial identifications from the photo array for each defendant was proper.

Harris' testimony that she identified defendants from photographs of the lineups and the introduction of those photographs into evidence was proper. The majority concludes that since the uncounseled lineups violated defendants' sixth amendment right, this testimony and evidence were a direct result of the constitutional violation and should have been excluded. As I have noted, I believe that the trial court was justified in finding that Curtis waived his right to an attorney at the lineup. Consequently, there was no primary illegality as to his lineup, and the subsequent photographic identification and testimony by Harris were not tainted, nor was the introduction into evidence of the lineup photograph. While the trial court suppressed the lineup identification of Ryder by Buckle, Ryder had no right to an attorney at a photographic display. (*United States v. Ash* (1973), 413 U.S. 300, 37 L. Ed. 2d 619, 93 S. Ct. 2568.) Moreover, assuming that the admission of evidence concerning Harris' photographic identification of either defendant was tainted, such introduction was harmless error because Harris had a clear and independent opportunity to view defendants during the occurrence and made a positive in-court identification. (*United States v. Wade* (1967), 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926; *People v. Strater* (1979), 72 Ill. App. 3d 486, 390 N.E.2d 979.) Since any error in the admission of the photographs or Harris' testimony was harmless, it is not a ground for reversal on appeal. *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824; *People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489.

Accordingly, I would affirm the judgments of convictions as to both defendants.