575 So.2d 1 (1990)
Earl Wesley BERRY
v.
STATE of Mississippi.
No. 89-DP-199.
Supreme Court of Mississippi.
December 19, 1990.
*3 David O. Bell, Oxford, for appellant.
Mike C. Moore, Atty. Gen., Marvin L. White, Jr., Asst. Atty. Gen., Charlene R. Pierce, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
BLASS, Justice, for the court:
On March 1, 1988, the grand jury of Chickasaw County indicted Earl Wesley Berry for the murder and kidnapping of Mary Bounds, and as an habitual criminal. Miss. Code Ann. § 97-3-19(2)(e) (Supp. 1990); Miss. Code Ann. § 97-19-81 (Supp. 1990). In a bifurcated trial, Berry was found guilty of capital murder and sentenced to death.
From the judgment, sentence, and denial of post-trial motions, Berry appeals, citing twenty-one errors. Finding no merit in the errors raised as to the guilt phase, we affirm the conviction for murder and kidnapping. We vacate the sentence of death and remand for a new sentencing trial.

*4 I.
Mary Bounds was reported missing around midnight, Sunday, November 29, 1987. Authorities located her automobile in Houston, near the Baptist Church. Blood was splattered around the driver's door of the car, and Mary Bounds' earrings were found near the car Tuesday morning. Cecil Woodard, Jr. found a pair of woman's shoes by the side of a road Monday morning. On learning that a woman was missing, he directed authorities to the place where he found them. Nearby, authorities discovered Mary Bounds' body.
We know details of the murder only from Earl Berry's own statements, corroborated by the physical evidence. Earl Berry, after leaving a friend's apartment, drove through Houston, Mississippi, at approximately 7:00 p.m., Sunday, November 29, 1987. He saw Mary Bounds near the Baptist Church, and approached her. As Berry reached for her, she screamed, he hit her and forced her into his car, after which he left town.
The first time Berry stopped, he took Mary Bounds into the woods, lifted her over a fence, and ordered her to lie down, intent on raping her. For reasons unknown, he did not actually commit the rape, but took his victim back to his car, telling her they would return to town. Once in the car, Berry drove, not into town, but south and turned off once again into another wooded area. Mary Bounds begged, for what, Berry could not say. Berry beat her with his fist and forearm, after which he carried her over a fence and deeper into the woods. At one point she was forced to the ground and he lay over her as a car approached. He carried her deeper into the woods, where he left her.
Berry drove south, eventually arriving at his grandmother's house, disposing of a mismatched pair of tennis shoes he was wearing on the way. On arrival he burned his bloodied clothes, then cleaned the blood from his car with a towel which he threw into the pond near the house.
A blue pajama top and dish towel were found in the pond behind Berry's house. Berry's knuckles were skinned when he was arrested. The mismatched tennis shoes were located with Berry's assistance. Mary Bounds' body bore wounds consistent with a beating, and her legs were badly scratched. She died of head injuries from blows.

GUILT PHASE

II.
Berry filed a motion to suppress all statements obtained from him by government agents. A hearing was held on October 18 and 19, 1988, on the motion to suppress. The motion was overruled on a finding that, "[T]he statement was freely and voluntarily given and that the constitutional requirements were met."
Findings by a trial judge that a confession was admissible are findings of fact, treated as any other findings of fact. As long as the trial judge applies the correct legal standards, his decision will not be reversed on appeal unless it is manifestly in error, or is contrary to the overwhelming weight of the evidence. David v. State, 551 So.2d 165, 169 (Miss. 1989); Frost v. State, 483 So.2d 1345, 1350 (Miss. 1986).
We examine the proceedings in light of this scope of review. The state initially presented the testimony of Billy Gore, investigator with the Mississippi State Highway Patrol. After Earl Berry testified, the state called Sheriff Bill Middleton, Sheriff of Webster County, and Jimmy Edwards, investigator with the Highway Patrol, whose recollection of the arrest and interrogation was essentially the same as Gore's.
Gore, accompanied by Sheriff Middleton, arrived at Berry's home at approximately 7:00 a.m., Sunday, December 6, 1987. Berry was advised of his Miranda rights and questioned about his whereabouts the previous weekend. Berry stated that he had been home all weekend. On being told that he had been seen in Houston in a white car, Berry denied having been in that car, but indicated that he had been in Houston in his own vehicle. Berry admitted having burned some clothing on the previous Sunday night, and told a story of having assisted *5 a hunter drag a deer from the woods. The officers obtained permission to search the automobile belonging to Berry's grandmother. A wrecker was called to tow the car. When the wrecker arrived, Berry was taken to the jail in Houston, and logged in at 9:40 a.m.
Billy Gore testified that the following occurred that afternoon between 4:30 and 5:00 p.m.:
Jimmy Edwards and I went back to the jail to attempt to talk to him again, and I went back to ask him if he would talk to us, and he said, "If I can make a phone call, I might talk to you." I said, "Okay. Who do you want to call?" He said, "A lawyer." I said, "Who is it?" He said, "Jim Waide. He's a fellow that helped me one time and he said if I ever needed any help, just call him." At that time, Roy Hill, a trustee, came into the hall with meals and I said, "We'll let him serve the supper and then I'll come and get you out." After supper, I got him out and brought him up to the Sheriff's office... . I said he could use that phone right there.
* * * * * *
Q. You say you let him out to make a phone call.
A. Right.
Q. Tell us what happened then.
A. He said, "I don't want to call." I said, "Well, are you still willing to talk to us?" He said, "Yes." I said, "Well, before we go any further, we got people pumping the pond out down there. Are your shoes or anything in there that we need to be looking for?" He said, "No." So I went and radioed the units down there and told them they could quit pumping the pond. And then I went back in the room where Jimmy Edwards was sitting in there with him. * * * I went over his right [Miranda rights] again. I really got surprised. When he asked to call an attorney, I told Jimmy Edwards, "He won't never talk to us. The attorney is going to tell him not to say anything." But then he just, out of the wild blue, went to telling about it. We didn't have to go into any questioning.
Berry then confessed to the murder of Mary Bounds. Gore composed a statement based on the interrogation. He read it back to Berry, who requested that two inclusions be made, one that he had been advised of his rights, and another referring to his brother's homosexuality, after which Berry signed the statement voluntarily.
Earl Berry's description of the arrest was quite different from Gore's account. According to Berry, he was never advised of his rights, but requested counsel immediately on arrest at 7:00 a.m., and several times thereafter. Berry denied having requested that Gore include the statement that Berry had been advised of his rights, but did agree that he had requested the statement referring to his brother's homosexuality.

A.
Arguably, when Berry indicated he wished to contact an attorney, he invoked his fifth amendment right to counsel. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1884-85, 68 L.Ed.2d 378 (1981); Smith v. Illinois, 469 U.S. 91, 98-99, 105 S.Ct. 490, 494, 83 L.Ed.2d 488 (1984). On being taken to the office and given the opportunity to call, however, Berry indicated that he no longer wished to contact an attorney when he said, "I don't want to call." Berry had said earlier that he might talk to the officers if he could first make a phone call. Gore, seeking clarification of Berry's position, asked, "Well, are you still willing to talk to us?" to which Berry replied, "Yes," indicating that he was willing to enter into a discussion of the crime. U.S. v. Velasquez, 885 F.2d 1076 (3rd Cir.1989). Having withdrawn his request to call a lawyer, and having stated that he was willing to talk to the officers, Berry was then asked only the question concerning the pond, and was once again advised of his Miranda rights, after which he confessed. We cannot find that the trial judge was manifestly wrong in his determination *6 that the statement was freely and voluntarily given and we find, further, that Berry knowingly and intelligently waived the right to counsel, if he had previously invoked it. Smith, 469 U.S. at 95, 105 S.Ct. at 492-93, 83 L.Ed.2d at 493. It is not the duty of the officers and prosecutors, nor the function of the courts, to insist that a person accused of a crime actually confer with a lawyer before talking about the crime, nor is there any prescribed procedure or form to be followed in the waiver of the right to such assistance.

B.
Berry cites several cases in support of his position, none of which dictates the outcome in this case.
In Smith, 469 U.S. at 91, 98-99, 105 S.Ct. at 494-95, 83 L.Ed.2d at 495-96 the accused, in response to questions concerning his understanding of the Miranda rights, indicated that he wanted to consult with a lawyer. Rather than terminate all interrogation, police officers continued to read the rights during which, in response to "Do you wish to talk to me at this time without a lawyer being present?" Defendant responded "Yeah and no, uh, I don't know what's what, really." Id. at 93, 105 S.Ct. at 491-92, 83 L.Ed.2d at 492. In finding that Smith had requested assistance of counsel, the court re-examined cases dealing with the accused's assertion of right to counsel. The accused, once he expressed his desire to deal with police only through counsel, is not subject to further interrogation until counsel has been made available to him, unless he validly waives the earlier request. This "rigid" prophylactic rule embodies two distinct considerations. First, did the accused actually invoke his right to counsel. Second, if the right was invoked, further questioning is permissible only on a finding that the accused (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked. Id. at 95, 105 S.Ct. at 492-93, 83 L.Ed.2d at 493 (citations omitted).
Applying the test in Smith, and using only Gore's testimony, Berry indicated that he was considering being represented by counsel when he said he wanted make a phone call to a lawyer. He did not ask for a lawyer, nor indicate any desire to deal with the police only through counsel. According to Gore all questioning ceased. Whether Berry's initial request to telephone Jim Waide is characterized as equivocal or unequivocal, all questioning ceased immediately. Berry was given the opportunity to telephone an attorney before further questioning. Berry, without any overreaching, pressure, or persuasion by the police, made the decision not to call. Gore's question clarified this waiver, after which Berry was asked only one question, about the pond. Berry was then again advised of his Miranda rights and made the confession.
Edwards indicates that after an accused has expressed a desire to deal with the authorities only through counsel, he may not be further questioned unless he himself initiates the discussion. Oregon v. Bradshaw, 462 U.S. 1039, 1046, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405, 412-13 (1983) discusses "initiation." In Bradshaw, the accused, after requesting an attorney, asked, "Well, what is going to happen to me now?" The U.S. Supreme Court stated that this was an "initiation" but that inquiries relating to routine incidents of the custodial relation would not "initiate" a new inquiry in the sense in which the word was used in Edwards. The Court indicated that it did not desire to build up a body of case law around the word "initiate." In the case before us, we find that Berry's statement to the officers in the sheriff's office, that he no longer wished to call a lawyer, either re-opened the old conversation or initiated a new one. Therefore, the recent U.S. Supreme Court decision, Minnick v. Mississippi, ___ U.S. ___, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), is inapplicable.
Berry contends that, assuming any question whatsoever was permitted after his unequivocal request for a lawyer, the only permissible questions were those intended to clarify the request, citing Thompson v. Wainwright, 601 F.2d 768 (5th Cir.1979). In Thompson the suspect was misled by *7 interrogating officers into abandoning his equivocal request for counsel. This was not the case here. The Fifth Circuit noted that the suspect had asked for counsel, but the interrogating officer explained that an attorney would probably advise him to say nothing depriving Thompson of his opportunity to tell his story. After Berry indicated that he did not wish to call a lawyer, Gore's question, "Well are you still willing to talk to us?" is analogous to a clarification of the request for counsel. In this case, the officer was attempting to ascertain whether Berry wished to continue the interrogation without advice of counsel. Without any "persuasion or presumption", or being misled or deceived in any way, Berry voluntarily replied "Yes."
This case is unlike United States v. Cherry, 733 F.2d 1124 (5th Cir.1984), in that Berry was clearly given the opportunity to telephone an attorney, and chose not to do so. In Cherry, FBI agents continued to question the suspect about the murder after he had equivocally requested an attorney failing to clarify whether he wanted to resume interrogation without counsel. Cherry, unlike Berry, had not indicated in any manner that he had decided to dispense with legal advice before giving a statement. Cherry, 733 F.2d at 1131.
United States v. Fouche, 776 F.2d 1398, 1405 (9th Cir.1985), adopts the Fifth Circuit's approach to a suspect's equivocal assertion of counsel, articulated in Cherry, and Thompson. Fouche indicated that he desired assistance of an attorney, and wanted to telephone his wife. After speaking with her, Fouche was advised of his Miranda rights, and asked if he wanted to make a statement, after which he confessed. The Fouche Court remanded for a finding of whether the interrogators had clarified Fouche's equivocal request for counsel. In the case sub judice, on Berry's request to telephone counsel, he was directed to a telephone, which he declined to use. Officer Gore's question clarified this failure to call, only after Berry volunteered that he did not wish to make the call.
Owen v. State, 849 F.2d 536, 539 (11th Cir.1988), is also distinguishable from the case before us. In Owen the circumstances surrounding defendant's confession were examined on a petition for habeas corpus. Owen, while being advised of his rights, interrupted the arresting officer with a statement that he would let them appoint counsel. On completion of the reading of the Miranda warnings, Owen refused to sign the waiver of rights form. Immediately thereafter, Owen confessed. In finding that Owen's request for counsel was not honored, the court cites Justice Rehnquist's dissent in Smith, 469 U.S. at 104, 105 S.Ct. at 497, 83 L.Ed.2d at 499, explaining the procedure to be followed when a suspect requests counsel while being informed of his rights. The police should complete the reading of the suspect's rights, then ask him to state clearly what he elects to do. If the suspect indicates that he wishes to remain silent the interrogation must cease. Owen, 849 F.2d at 539. Clearly, the officers in this case honored Berry's request for counsel, as expeditiously as possible. Immediately after Berry finished his meal, he was provided a telephone with which to contact an attorney. Berry chose not to do so, then clearly indicated that he was willing to continue the interrogation without aid of counsel.
In People v. Hammock, 121 Ill. App.3d 874, 77 Ill.Dec. 322, 460 N.E.2d 378 (1984), police arrested the defendant late Friday night on a speeding charge, and questioned him Sunday about a Friday afternoon homicide. In response to Miranda warnings, Hammock indicated he could obtain a lawyer on Monday. Questioning ceased for a short time. On resumption of questioning by the police, Hammock agreed to give a statement after which the assistant state's attorney asked Hammock if he wanted to see his lawyer first. Hammock replied negatively then confessed. This confession was found to be inadmissible because the police, not Hammock, had initiated the interrogation. Hammock, 77 Ill. Dec. at 325, 460 N.E.2d at 381. That is not the case here. In this case, Berry initiated when he indicated he no longer wished to telephone his attorney. One cannot halt an inquiry by first indicating a desire to call a *8 lawyer, then declining to do so when offered the opportunity.
Bryant v. State, 49 Md. App. 272, 431 A.2d 714 (1981), was a case in which defendant requested a lawyer, the interrogating officer called a public defender but was told all defenders were out, after which the officer indicated that co-defendants were making statements against the defendant, after which he confessed. The appeals court reversed stating that the officer's conduct was an attempt to have defendant renounce his request "because the battle was lost anyway." The court noted, "It is precisely that type of `persuasion,' duress, coercion, or intimidation that is forbidden by Miranda and Edwards." No elements of persuasion, duress, coercion, or intimidation are evident in the case sub judice.
Here, as in Griffin v. Lynaugh, 823 F.2d 856 (5th Cir.1987), the purpose of Miranda is to assure that an individual's right to choose between speech and silence would not be served by suppression of the confession, in the absence of police overreaching. Griffin, 823 F.2d at 863.
Kirkland v. State, 559 So.2d 1046 (Miss. 1990) was a case in which the accused, on being arraigned in justice court, requested court appointed counsel. An investigator, despite hearing this request, questioned Kirkland immediately after the accused left the courtroom elicting an admission. In reversing, this Court found no intelligent, knowing waiver of the right to counsel, simply from the reading of the Miranda warnings. Kirkland is not controlling in this case. We find that Berry specifically waived his right to counsel when he decided not to call an attorney, and in response to Gore's question, made it specifically clear by a positive statement that no, he did not desire an attorney to advise him before responding to any more questions about the crime.
We affirm the lower court, finding that the state established each fact which is prerequisite to the admissibility of the confession. Kirkland, 559 So.2d at 1047.

III.
Berry moved for change of venue prior to trial, raising a rebuttable presumption that he could not obtain a fair trial in Chickasaw County. The trial court is to consider pre-trial publicity in determining the ability of jurors to impartially consider the evidence at trial. Elements which, when present, serve as an indicator to the trial court that the presumption raised is irrebuttable are set out in White v. State, 495 So.2d 1346, 1349 (Miss. 1986). The presumption of prejudice may be rebutted by the state's demonstration that an impartial jury was actually impaneled in the appellant's case. Harris v. State, 537 So.2d 1325, 1328-29 (Miss. 1989). The decision to deny a change of venue is vested in the sound discretion of the trial court. Lutes v. State, 517 So.2d 541 (Miss. 1987).
Berry's motion for change of venue was primarily based on the extensive publicity prior to trial, making the selection of an impartial jury unlikely. Evidence otherwise inadmissible was contained in the published reports of the crime and the victim was a prominent person in Chickasaw County. A hearing was held on these motions on September 2, 1988. The state presented eleven witnesses; defense presented three. Witnesses for the prosecution testified that in their opinions Berry could receive a fair trial in Chickasaw County. All testified that they were familiar with the county and its residents and there was no prejudice against Berry.
Defendant's first witness, Kenny Hobbensell, publisher of the Times Post, testified that he wrote the story of the murder and arrest of Berry. The story included references to Berry's prior police record and the fact that Berry had served a prison sentence at Parchman. The Times Post had a circulation of 8,600, approximately 70% of which is in Chickasaw County. On cross-examination, Hobbensell testified that he felt the publicity had not so saturated the community that Berry could not receive a fair trial. The two other witnesses testifying that Berry could not obtain a fair trial were related to Berry by marriage. *9 Neither testified to familiarity with the county and its residents.
In denying the motion for change of venue, the court found that no evidence was presented by the defense which would warrant a change of venue.
We find no abuse of discretion in this ruling. Neither did the court abuse its discretion in denying a county wide venire.

IV.
Berry argues that the failure of the trial court to remove six jurors for cause deprived him of a fair trial, citing Mhoon v. State, 464 So.2d 77 (Miss. 1985); Rush v. State, 238 Ark. 149, 379 S.W.2d 29, 32 (1964) (juror must be excused who has formed an opinion that would take evidence to remove even if he will listen to the evidence); and State v. Bennett, 382 S.E.2d 322 (W. Va. 1989) (prospective juror who knew defendant's children and victim and had heard rumors about defendant should have been excused for cause; prospective juror whose sister-in-law was secretary to the prosecutor should have been excluded even though she said she could be fair; trial judge admitted doubt as to whether juror should be permitted on jury).
Only one of the six actually served on the jury, Hazel O'Barr. She was a member of the original tender, and was not challenged at a time when defense had 12 peremptory challenges.
Denial of challenge for cause is not error where it is not shown that the defense has exhausted peremptory challenges and is thus forced to accept the juror. Rush v. State, 278 So.2d 456, 458 (Miss. 1973). This threshold test is applicable in a capital murder case. Billiot v. State, 454 So.2d 445, 457 (Miss. 1984). A prerequisite to a claim that the trial court erroneously forced a defendant to accept an incompetent juror is exhaustion of peremptory challenges. Chisolm v. State, 529 So.2d 635 (Miss. 1988). The standard used in examining the conduct of the voir dire is abuse of discretion. Billiot, 454 So.2d at 457.
Defense counsel accepted O'Barr. Peremptory challenges were exercised to exclude Holliman and Bennet. Chrestman, Davis, and Simpson were not reached. At the completion of the selection process defense still had one challenge left as well as an alternate challenge. In addition defense counsel never raised any objection to the other named prospective jurors, who defense now contends should have been excused for cause.
We find this assignment without merit.

V.
Berry contends that the prosecutor improperly vouched for the credibility of his witness by placing the credibility of the government behind the witness, in violation of case law and Miss.Rules of Professional Conduct Rule 3.3.
Procedurally, Berry made no contemporaneous objection and is barred from raising this issue. Cole v. State, 525 So.2d 365, 369 (Miss. 1987).
Substantively, broad latitude is afforded the attorneys in closing argument, and the prosecutor did not exceed the limits of argument in this case. The remarks complained of relate to an issue raised by the defense on cross-examination of Officer Gore and the direct examination of Berry. Gray v. State, 351 So.2d 1342, 1346-47 (Miss. 1977); Nelms & Blum Co. v. Fink, 159 Miss. 372, 282-83, 131 So. 817, 820-21 (1930).
Additionally, the trial court was not asked to admonish the jury regarding the allegedly inappropriate comments, and cautionary instructions were given indicating that the testimony of a police officer is entitled to no special or exclusive sanctity.
This assignment is without merit.

VI.
Eleven photographs and slides of the victim were entered into evidence over the objection of the defendant. Berry argues that the probative value of these photos is outweighed by their prejudicial effect. McNeal v. State, 551 So.2d 151 (Miss. 1989); *10 Kniep v. State, 525 So.2d 385, 388 (Miss. 1988); Miss.R.Evid. 403.
Admissibility of photographs rests within the sound discretion of the trial judge. Griffin v. State, 557 So.2d 542, 550 (Miss. 1990). We find this assignment is without merit. Having viewed the pictures, we find their probative value was not outweighed by their prejudicial effect.

VII.
Officer Gore's testimony revealed that the police had received a letter from an anonymous source indicating that Mrs. Bounds may have been mistakenly murdered in place of another. We do not see that this would in any way tend to exculpate the defendant. Out of the presence of the jury, the court examined this letter. When Officer Gore took the stand, defense counsel had the opportunity to question him about the letter. The state objected to the introduction of the letter as irrelevant and hearsay. The court offered to grant defendant a continuance to give time to investigate the contents of the letter. After a fifteen-minute break, defense counsel said he did not desire a continuance, nor did he want to question Officer Gore further.
The remedial procedure to be followed when such a discovery violation is made is the granting of continuance. Nixon v. State, 533 So.2d 1078, 1090 (Miss. 1987); Cole v. State, 525 So.2d at 367; Box v. State, 437 So.2d 19 (Miss. 1983). The remedy for tardy disclosure of that to which a defendant is entitled to in pre-trial discovery, under these circumstances, is a continuance. Moore v. State, 536 So.2d 909, 911 (Miss. 1988). The right to a continuance is not self-executing but defense must affirmatively request it on pain of waiver. Cole, 525 So.2d at 368.
Berry was given the opportunity for a continuance and specifically refused it. We find Berry has waived this error.

VIII.
Berry requested, and the court refused, two lesser included offense instructions.
D-6
The chief difference between murder and manslaughter is the presence of deliberation and malice in murder and its absence in manslaughter.
D-7
The Court instructs the jury that if the jury can deduce from the facts and circumstances surrounding the case, either from the evidence or lack of evidence, any reasonable hypothesis consistent with the Defendant's guilt of a lesser offense than Capital Murder, then there is a reasonable doubt of his being guilty of Capital Murder, and the jury should return one of the following verdicts:
We the jury, find the Defendant not guilty of Capital Murder, but we do find the Defendant guilty of Manslaughter, in which case the Court shall sentence him as provided by law.
or
We, the jury, find the Defendant not guilty of Capital Murder, but we do find the Defendant guilty of Aggravated Assault, in which case the Court shall sentence him as provided by law.
Berry contends that it was error for the court not to instruct the jury to consider a verdict of guilt of a non-capital offense, citing Hopper v. Evans, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982) and Beck v. Alabama, 447 U.S. 625, 638, 100 S.Ct. 2382, 2390, 65 L.Ed.2d 392, (1980). The rule is that a lesser included offense instruction should be given if the evidence would permit a jury rationally to find the defendant guilty of the lesser offense. Cordova v. Lynaugh, 838 F.2d 764, 767 (5th Cir.1988). The unconstitutional denial of a lesser included offense instruction in a capital case can never be harmless error. Cordova, 838 F.2d at 767. The defendant may request a lesser offense instruction if the lesser offense arises out of a nucleus of operative fact common with the factual scenario giving rise to the charge laid in the indictment. Whitehurst v. State, 540 So.2d 1319, 1327 (Miss. 1989); Gangl v. State, 539 So.2d 132, 136 (Miss. 1989). Berry argues *11 that manslaughter is a lesser offense in this case under Miss. Code Ann. § 97-3-27 (1972), and a reasonable hypothetical juror could have convicted Berry of manslaughter under the statute, if he failed to find Berry guilty of kidnapping Mary Bounds, but did find that Berry killed her without premeditation, citing Mease v. State, 539 So.2d 1324 (Miss. 1989). Berry cites Fairchild v. State, 459 So.2d 793, 800 (Miss. 1984) for the proposition that in the context of a capital murder prosecution, a lesser offense instruction cannot be denied on grounds that a killing in the course of an underlying felony can only be capital murder, for this is equivalent to granting a directed verdict for the State on the underlying felony. Fairchild sets the evidentiary standard for denying the lesser offense instruction:
Only if this Court can say, taking the evidence in the light most favorable to the accused, and considering all reasonable favorable inferences which may be drawn in favor of the accused from the evidence, and considering that the jury may not be required to believe any evidence offered by the State, that no hypothetical, reasonable jury could convict [the defendant] of [the lesser offense], can it be said that the refusal of a lesser-included offense instruction was proper.
Fairchild, 459 So.2d at 801 (citing Ruffin v. State, 444 So.2d 839, 840 (Miss. 1984)).
The instructions requested by Berry are identical to two of the instructions requested in Mease, 539 So.2d at 1327 n. 4, which this Court found not to "fit precisely the standard of Section 97-3-27." Mease, 539 So.2d at 1334. In Mease, this Court applied the evidentiary standard laid out in Fairchild, quoted above, examining the evidence presented at trial as it related to the manslaughter statute. This approach is used here. Miss. Code Ann. § 97-3-27 reads:
The killing of a human being without malice, by the act, procurement, or culpable negligence of another, while such other is engaged in the perpetration of any felony, except rape, burglary, arson, or robbery, or while such other is attempting to commit any felony besides such as are enumerated and excepted, shall be manslaughter.
Berry was indicted for murder under Miss. Code Ann. § 97-3-19(2)(e) (Supp. 1989). The underlying felony was kidnapping which is not an excepted felony; therefore, Berry is not precluded from use of the manslaughter instruction.
Berry presents two possible scenarios under which the jury could have concluded that kidnapping was not proven beyond a reasonable doubt, neither of which is supported by the evidence. First, blood was found at Bound's automobile and her earrings were scattered, implying a struggle, at that point, negating the possibility that the jury could have doubted that Bounds was forced into Berry's vehicle. Second, Miss. Code Ann. § 97-3-19(2)(e) (Supp. 1989) makes the killing in the attempt of kidnapping a capital murder. Therefore, had the jury found that Bounds was killed at her vehicle in the attempted kidnapping, Berry could have still been convicted of capital murder.
In Beck, two possible crimes fit the facts, "capital robbery-intentional killing" or "felony murder". The death penalty was imposed on conviction of the former. The "intent" element necessary for imposition of the death penalty could not be supplied by the felony-murder doctrine. Under the statute the judge was specifically prohibited from giving the jury the option of convicting the defendant of a lesser included offense. Presumably, the jury could conclude that the elements of both were proven, with the exception of intent, and the only options would be to acquit or convict on the capital crime. This is not the case with Berry, or with the Mississippi statutes and case law. The United States Supreme Court in Beck favorably cites Jackson v. State, 337 So.2d 1242 (Miss. 1976). Beck, 447 U.S. at 635, 100 S.Ct. at 2388-89, 65 L.Ed.2d at 401 n. 10. This Court in Jackson struck down part of Mississippi's post-Furman death penalty statute which contained a similar prohibition on charging lesser included offenses, while warning that lesser included offense instructions *12 should not be given indiscriminately or automatically, but when warranted by the evidence.
While Berry's statement indicates that he did not intentionally set out to murder Mary Bounds, the manner in which Mary Bounds was killed must be examined. We must determine whether  taking the evidence in the light most favorable to the accused, and considering all reasonable favorable inferences which may be drawn in favor of the accused from the evidence  a hypothetical reasonable jury could convict him of manslaughter.
The crime of manslaughter is defined as a killing without malice. Malice has been defined as:
The intentional doing of any wrongful act in such manner and under such circumstances as that the death of a human being may result therefrom is malice.... [M]alice is implied, and hence murder exists, whenever a death occurs as a result of some willful act by the accused under circumstances where he knows the act is likely to cause death or serious bodily injury.
Garrett v. State, 749 S.W.2d 784, 789 n. 7 (Tex. Crim. App. 1986) (citing Banks v. State, 85 Tex.Crim. 165, 211 S.W. 217 (1919)).
Malice in murder may also be shown by proof that, `in the circumstances known to the defendant, a reasonably prudent person would have known that according to common experience there was a plain and strong likelihood that death would follow the contemplated act.'
Commonwealth v. Bray, 407 Mass. 296, 553 N.E.2d 538, 541 (1990).
Additional definitions include: "a malicious act is one intended to bring harm to another person." Shell v. State, 307 Md. 46, 512 A.2d 358, 368-69 (1986). "Malice is an intent to kill or to do grievous bodily injury, or to do an act which would usually cause death or great bodily harm where there is no justification, excuse or mitigation." Franklin v. State, 319 Md. 116, 571 A.2d 1208, 1209, (1990). "An intention to inflict injury on the victim which is not justified on any lawful ground or palliated by the existence of any mitigating circumstances is malicious within the meaning of the law." Commonwealth v. Matthews, 406 Mass. 380, 548 N.E.2d 843, 851 (1990). "Malice refers to various culpable mental states; it encompasses the intent to kill or inflict great bodily harm, as well as wickedness of disposition, hardness of heart, and reckless disregard for social duty." Commonwealth v. Hart, 388 Pa.Super. 484, 565 A.2d 1212, 1217 (1989). "Malice in law is not necessarily personal hate or ill will, but it is that state of mind which is reckless of law and of the legal rights of the citizen." Black's Law Dictionary 862 (5th ed. 1979).
Dr. Ricky Hicks, pathologist, determined that the cause of Mary Bounds death was blunt trauma to the head. The injuries were consistent with injuries inflicted by hands and feet. In other words, Mary Bounds was beaten to death. We find that no reasonable hypothetical juror could find that this killing was without malice and Berry was not entitled to the lesser included offense instruction.

IX.
The State introduced a plaster cast and photographs of footprints found near the body. Officer Gore testified that these were taken from the area in which the body was found. Deborah Haller, forensic toxicologist with the Mississippi Crime Lab, testified that the sample was insufficient to connect the defendant's shoes to the cast.
A trial judge has considerable discretion in determining the admissibility of evidence and unless that discretion is so abused as to be prejudicial to the accused, the judge's ruling will not be disturbed on appeal. Corley v. State, 536 So.2d 1314, 1318 (Miss. 1988).
There is no dispute that the footprints were actually found at the scene of the crime, and the trial court did not abuse its discretion in admitting the footprint exhibits. Stokes v. State, 518 So.2d 1224, 1227 (Miss. 1988) (pliers belonging to defendant admissible although no proof offered that these pliers were used to inflict injury); Shearer v. State, 423 So.2d 824, 826 (Miss. 1983) (amount of blood so small that *13 it could not even be identified as human); Miss.R.Evid. 401, 402 and 403.
We find no abuse of discretion in allowing the evidence of the shoe prints. Assuming, arguendo, the evidence should not have been admitted, we cannot see how the defendant was harmed. This assignment is without merit.

X.
Berry contends that the indictment charged him with intentional murder; that the indictment also assigned a maximum penalty of life; and that the jury instructions failed to include a charge that the murder was intentional. Therefore, he argues, the State failed to prove the crime for which Berry was indicted and this conviction must be reversed.
Berry concedes that Miss. Code Ann. § 97-3-19(2)(e) does not require intent, but contends that the State, by indicting for intentional murder, must be held to a higher standard of proof, citing Carter v. State, 650 S.W.2d 843, 846 (Tex. Ct. App. 1982). Berry cites Dorroh v. State, 229 Miss. 315, 90 So.2d 653, 655 (1956) for the proposition that willfull is virtually the same as intentional.
Procedurally, Berry neither raised this issue in his motion to quash, nor in the hearing on that motion. Berry's motion to quash stated six grounds, none of which includes the issue raised on appeal. We find that Berry is procedurally barred from raising this issue on appeal.
Substantively, the indictment was sufficient to give the defendant fair notice of the crime charged. Bell v. State, 360 So.2d 1206, 1208-09 (Miss. 1978). See also Williams v. State, 445 So.2d 798, 804 (Miss. 1984) (purpose of indictment is to provide description of charge which will enable accused to prepare defense; all that is required is a concise statement of the crime); Bullock v. State, 391 So.2d 601, 606 (Miss. 1980) (indictment gives accused fair notice of the crime charged); Culberson v. State, 379 So.2d 499 (Miss. 1979).
This assignment is without merit.

SENTENCING

XI.
After the jury had retired to consider whether Berry should be sentenced to death, a hearing was held on the habitual offender portion of Berry's indictment. The state offered proof of seven prior convictions: two escapes; two grand larceny convictions; perjury; burglary; and simple assault on a law enforcement officer. The court found that the requirements of Miss. Code Ann. § 99-19-81 were met and adjudged Berry an habitual criminal, ineligible for probation or parole. Shortly thereafter the jury returned from its deliberation and delivered the sentence of death, having never been informed that Berry could never be paroled, if given a life sentence.
We can see no reason why the jury should not be informed that "life" means, "life, without probation or parole." Indeed, we can see compelling reasons to require that the jury know this before sentencing a man to die. Consequently, in any case in which the imposition of the death penalty is possible, the habitual offender hearing should be held prior to jury deliberations on the death penalty. Here, any element of speculation or uncertainty as to Berry's status as an habitual criminal and whether he could be placed on probation or paroled was removed before the jury sentenced him to death. Mhoon v. State, 464 So.2d 77 (Miss. 1985). The jury should have been informed on this point before considering its sentencing options. We find the reasoning of the Supreme Court of New Mexico in State v. Henderson, 109 N.M. 655, 789 P.2d 603, 606-07 (1990) on this issue to be compelling, and hereby adopt the following:
We base our decision herein on the fundamental fairness, due process and eighth amendment rationales implicit in the decision in California v. Ramos, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), to the effect that "`the jury [must] have before it all possible relevant information about the individual defendant whose fate it must determine,'" id. *14 at 1003, 103 S.Ct. at 3454 (quoting Jurek v. Texas, 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976)), and in McCleskey v. Kemp, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), to the effect that states cannot limit the sentencer's consideration of any relevant circumstance that could "cause it to decline to impose the death sentence." Id. at 304, 107 S.Ct. at 1773.
The "qualitative difference of death from all other punishments", Caldwell v. Mississippi, 472 U.S. 320, 329, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231, 239 (1985) (quoting California v. Ramos, 463 U.S. at 998-99, 103 S.Ct. at 3452), has resulted in many limitations on the imposition of capital punishment which are rooted in a concern that the sentencing process should facilitate the responsible and reliable exercise of sentencing discretion. Caldwell, 472 U.S. at 329, 105 S.Ct. at 2639, 86 L.Ed.2d at 239. Accurately informing the jury that the alternative to the death penalty is life, without benefit of probation or parole, can only enhance the sentencing process, insuring that excessive punishment shall not be inflicted. U.S. Const. amend. VIII, XIV; Miss. Const. art. 3 § 27.
On remand, the jury is to be informed that Berry has been adjudged an habitual criminal.

XII.
We address only those errors raised by Berry which are likely recur on remand.

A.
Berry argues that the aggravating circumstance, "previous conviction of a felony involving the use or threat of violence to the person" is invalid. The prosecution offered a certified copy of the judgment which was received as evidence without objection. The asserted reason for the invalidity is not that the underlying prior conviction was reversed or vacated, but that Berry was awarded damages in the amount of $15,000 as the result of a successful civil suit against the police officer who shot Berry. Despite these disturbing facts, the trial court cannot retry all prior convictions; thus, we have held the trial judge is not required to look beyond the prior conviction, valid on its face. Nixon v. State, 533 So.2d at 1099.

B.
The aggravating circumstance instruction regarding an "especially heinous, atrocious or cruel" offense was presented for jury consideration without the limiting instruction, mandated in Coleman v. State, 378 So.2d 640 (Miss. 1979). Absent this limiting instruction the charge fails to adequately channel the jury's discretion. Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).
On remand, the jury is to be given the limiting instruction. Further, if the question is again presented, the court may address anew the question of a change of venue.
AFFIRMED AS TO GUILT. REVERSED AND REMANDED FOR A SENTENCING TRIAL CONDUCTED IN ACCORDANCE WITH THIS OPINION.
DAN M. LEE, P.J., and PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.
ROY NOBLE LEE, C.J., dissents with separate written opinion, joined by PITTMAN, J.
PITTMAN, J., dissents with separate written opinion, joined by ROY NOBLE LEE, C.J.
HAWKINS, P.J., not participating.
ROY NOBLE LEE, Chief Justice, dissenting:
I do not agree that the lower court erred in its refusal to grant an instruction that appellant was an habitual offender and would never be eligible for parole. In my view, the majority opinion errs in reversing and remanding the case to the lower court for a new trial on the sentencing phase, Issue XI, for failure to grant such an instruction. I adopt my dissenting opinion in Turner v. State, 573 So.2d 657 (Miss. 1990) *15 handed down this day, which case involves the same question.
In addition, Issue XII B relates to the aggravating circumstance instruction regarding an "especially heinous, atrocious or cruel" offense which was presented for jury consideration without the limiting instruction, set forth in Coleman v. State, 378 So.2d 640 (Miss. 1979). In the recent case of Robert Lee Shell v. State, ___ U.S. ___, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990), the United States Supreme Court held that the limiting instruction used to define "especially heinous, atrocious or cruel" aggravating factor for capital murder was unconstitutionally vague. In a per curiam decision, the Court said:
The motion of petitioner for leave to proceed in forma pauperis and the petition for a writ of certiorari are granted. To the extent that the Mississippi Supreme Court [Shell v. State], 554 So.2d 887 [Miss. 1989], relied on the "especially heinous, atrocious, or cruel" aggravating factor in affirming petitioner's death sentence, its decision is reversed. See Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). Although the trial court in this case used a limiting instruction to define the "especially heinous, atrocious, or cruel" factor, that instruction is not constitutionally sufficient. See Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980); Cartwright v. Maynard, 822 F.2d 1477, 1489-1491 (CA10 1987), aff'd, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). The case is remanded to the Mississippi Supreme Court for further consideration in light of Clemons v. State, 494 U.S. ___, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990).
The courts have such problems with the above instruction, I suggest that such aggravating circumstance not be used.
PITTMAN, J., joins this opinion. HAWKINS, P.J., not participating.
PITTMAN, Justice, concurring in part and dissenting in part:
I concur with the majority's affirmance of the guilt of Earl Wesley Berry in murdering Mary Bounds.
I dissent from the majority's reversal of the sentencing of Earl Wesley Berry and in the remand for a new sentencing trial.
To reverse, the majority writes new law. The majority changes the rules and procedures heretofore approved by this Court in such a way that the prosecution fails and the convicted murderer gets another chance at sentencing. The State is hard pressed to know what this Court will do; in this case the State followed what the Court had approved in the past and is reversed because the majority no longer supports that which the Court had approved in prior death penalty cases. The majority, in this case, and in many other criminal cases, exercises the luxury of second-guessing the trial court in the manner in which it conducts the habitual offender hearing. The majority second-guesses the trial court in that the majority, for the first time, requires that the jury be instructed that a life sentence would be life without parole according to § 99-19-81 of the Mississippi Code Annotated as it now exists. Should not the majority further require the jury to be instructed that the governor still has the power to pardon? Should not the majority require that the jury be instructed that the legislature may also by new law provide for pardon.
Here the Court also second-guesses the defendant in that we require the trial court to give a jury instruction which the defendant did not request.
This was a heinous crime committed by a habitual offender and certainly the facts of this case do not create a situation that should initiate a change in law that is announced today by a majority of this Court. The change in law by the majority causes the trial court and the prosecution to fail because the majority changes its position on how a law may be employed by the lower court. The majority second-guesses and changes and picayunes the law in the procedure of the trial court to the surprise of the State, to the benefit of the convicted murderer, and to the harm and danger of the law-abiding community.
*16 There are times when the circumstances, the facts, and even the law, seem to be clear and settled and properly employed. It is at those times when all seems to be in accordance with what we have approved that this Court should not confuse, change, complicate or create new issues, new procedures, new rules and new interpretations. That which we have made plain in the past should continue to be plain in cases where there appears to be no doubt concerning guilt and where the instruction required by the majority concerning life without parole is an instruction that was not even requested by the defense. The uncomplicated should not be complicated, the unannounced should not be announced, and the rightfully done should not be undone. I would affirm the sentence of the trial court.
ROY NOBLE LEE, C.J., concurs.